IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PEGGY J. BRUMWELL, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 06-696-JJF |
| | : |
| MICHAEL J. ASTRUE, | : |
| Commissioner of Social | : |
| Security, | : |
| | : |
| Defendant. | : |
| | : |
| | : |

Eva I. Guerra, Esquire of EVA I. GUERRA, ESQUIRE, White Lake, Michigan.
Attorney for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, and David F. Chermol, Esquire, Special Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware. Of Counsel: Michael McGaughran, Esquire, Regional Chief Counsel, and Kelly C. Connelly, Esquire, Assistant Regional Counsel of the SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania. Attorneys for Defendant.

**MEMORANDUM OPINION**

March $\partial\mathcal{S}$, 2008
Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is an appeal pursuant to 42 U.S.C. § 405(g) filed by Plaintiff, Peggy J. Brumwell, seeking review of the final administrative decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 401-433. Plaintiff has filed a Motion For Summary Judgment (D.I. 15) requesting the Court to enter judgment in her favor. In response to Plaintiff's Motion, Defendant has filed a Cross-Motion For Summary Judgment (D.I. 17) requesting the Court to affirm the Commissioner's decision. For the reasons set forth below, Defendant's Motion For Summary Judgment will be granted and Plaintiff's Motion For Summary Judgment will be denied. The decision of the Commissioner dated January 5, 2006, will be affirmed.

## BACKGROUND

### I. Procedural Background

Plaintiff filed an application for DIB on May 5, 2004, alleging a disability onset date of February 15, 2002, due to anxiety, depression, irritable bowel syndrome, low potassium, anemia, arthritis, acid reflux and a ruptured disc in her back. (Tr. 54, 57.) Plaintiff's application was denied initially and upon reconsideration. (Tr. 33, 35.) Thereafter, Plaintiff requested a hearing before an administrative law judge (the

1

"A.L.J."). On January 5, 2006, the A.L.J. issued a decision
denying Plaintiff's application for DIB. (Tr. 16-24.) Following
the unfavorable decision, Plaintiff filed a timely Request For
Review Of Hearing Decision/Order. (Tr. 12.) On September 22,
2006, the Appeals Council denied Plaintiff's request for review
(Tr. 5-7), and the A.L.J.'s decision became the final decision of
the Commissioner. Sims v. Apfel, 530 U.S. 103, 107 (2000).

After completing the process of administrative review,
Plaintiff filed the instant civil action pursuant to 42 U.S.C. §
405(g), seeking review of the A.L.J.'s decision denying her claim
for DIB. In response to the Complaint, Defendant filed an Answer
(D.I. 7) and the Transcript (D.I. 9) of the proceedings at the
administrative level.

Thereafter, Plaintiff filed a Motion For Summary Judgment
and Opening Brief in support of the Motion. In response,
Defendant filed a Cross-Motion For Summary Judgment and a
combined opening brief in support of his Cross-Motion and
opposition to Plaintiff's Motion requesting the Court to affirm
the A.L.J.'s decision. Plaintiff has declined to timely file a
Reply Brief. Accordingly, this matter is fully briefed and ripe
for the Court's review.

## II.  Factual Background

### A.  Plaintiff's Medical History, Condition and Treatment

At the time of the A.L.J.'s decision, Plaintiff was fifty-
five years old.  She has a twelfth grade education and received
additional training as a "medical coder."  (Tr. 74.)  Plaintiff's
past relevant work was performed at the light exertional level
and includes work as a medical records technician at a hospital.
(Tr. 385.)

Although Plaintiff alleges a disability onset date of
February 2002, the earliest medical records in evidence are dated
April 2002.  (Tr. 166-167.)  On April 12, 2002, Plaintiff
reported to Associates In Medicine regarding the need to
establish a primary care relationship due to a recent relocation
to the area.  Plaintiff reported, as part of her past medical
history, chest pain with occasional PVC's and palpitations
attributed after work-up to caffeine and cigarette smoking,
multiple joint pains secondary to osteoarthritis, degenerative
disease mostly in the hips, knees and lower back, a ruptured disc
at L5, S1 in the 1980s, a history of high blood pressure since
1996, irritable bowel syndrome and low potassium levels.
Plaintiff was ordered to undergo a chest x-ray to evaluate her
complaints of thoracic pain and was to follow-up in the next 1-2
months for a complete physical.  (Tr. 166-167, 169.)

3

Approximately four months later, in August 2002, Plaintiff returned to Associates In Medicine for an annual physical with Dr. Wallace. (Tr. 159-162.) Dr. Wallace noted that the results of Plaintiff's chest x-ray were negative. Dr. Wallace noted that her thoracic pain had resolved, but that she complained of left sided chest pain and shortness of breath. Dr. Wallace recommended a CT scan of the chest to rule out cardiac disease and adding a banana to her diet each day to increase her potassium levels. Dr. Wallace also noted that Plaintiff suffered from "[h]ypertension, ? control" and that her anxiety and depression were currently stable and considered "well controlled." (Tr. 162.)

Plaintiff underwent a CT scan of the chest (Tr. 158), a carotid duplex scan (Tr. 157) and a stress EKG (Tr. 154), all of which were normal. During the stress EKG, Plaintiff demonstrated "good exercise tolerance for [her] age." (Tr. 154.)

In September 2002, Plaintiff was examined by David V. Reindl, M.D., a gastroenterologist and an internist. (Tr. 181-183.) Plaintiff reported feeling "quite well" with no weight loss, rectal bleeding or significant abdominal pain, except for abdominal spasms, and no change in bowel habits. (Tr. 181.) Plaintiff underwent a colonoscopy in connection with her anemia (Tr. 176-177), and the results of the colonoscopy were normal. Plaintiff was prescribed medication for irritable bowel syndrome.

4

(Tr. 175.)

In August 2003, Plaintiff returned to Dr. Wallace for her annual physical. Plaintiff's potassium levels had returned to normal, but there were some EKG changes. (Tr. 141-142.) Dr. Wallace recommended further testing for possible cardiac problems.

Plaintiff underwent a chest x-ray and echocardiagram, both of which were normal. Plaintiff also had a stress EKG which again showed no abnormalities and "good exercise tolerance." (Tr. 134-136.) Through 2004, Plaintiff had no significant medical treatment other than treatment for colds and earaches.

Plaintiff underwent a consultative examination with Julio DePena, M.D., on July 13, 2004. (Tr. 197-200.) Plaintiff reported with complaints of depression, generalized anxiety disorder, irritable bowel syndrome, panic attacks, and lack of concentration. Plaintiff denied blurred vision, decreased vision, palpitations and shortness of breath, although she admitted to occasional palpitations during panic attacks. She also denied any memory problems, except when she is "very stressed." (Tr. 198.) Dr. DePena opined that a change in her anxiety medication "should control her symptoms significantly and revert all her symptoms back to normal." (Tr. 199.) Dr. DePena found no physical problems other than mildly limited left shoulder motion, which he suggested could be examined further

with an MRI in the future. (Tr. 199-200.)

Less than ten days later, Plaintiff treated with Delmarva Family Resources for complaints of adjustment disorder with depressed mood and anxiety. (Tr. 195-196.) Plaintiff was assessed a global assessment of functioning score of 40. On initial examination, Plaintiff was noted to have normal memory and fair concentration, as well as logical, sequential and goal-directed thought flow.

On September 2, 2004, Plaintiff underwent a psychological consultative evaluation with Peter J. Lamb, Ph.D. (Tr. 204-208.) Dr. Lamb found Plaintiff to be alert, oriented x3, coherent, and cooperative. Her insight seemed good and her judgment was fair to good. Plaintiff's affect was anxious, but her thought content was appropriate and her memory was good for remote, recent and immediate events. Plaintiff also had good levels of concentration and fair to good computational skills and working memory. Plaintiff's mood was noted to be somewhat depressed.

Dr. Lamb found Plaintiff had a mild degree of impairment on her daily activities, her ability to relate to others, her constriction of interests, and her ability to carry out instructions. Plaintiff had a moderate impairment concerning her ability to cope with the pressures of ordinary work and perform routine, repetitive tasks. Plaintiff was also noted to have a moderately severe degree of impairment in her ability to sustain

6

work performance and attendance in a normal work setting. Dr. Lamb noted that his opinion in this area took into account Plaintiff's physical problems, as well as her psychological issues. (Tr. 207-208.)

Plaintiff's medical records were reviewed by two state agency physicians in September and October 2004. (Tr. 209-218, 219-238.) David A. Haaland, M.D., found that Plaintiff could perform a full range of medium work (Tr. 210-215), while Christopher King, Psy. D., found that Plaintiff could perform simple routine work, despite moderate limitations in social functioning and managing complex tasks. (Tr. 220-221.) Both Dr. Haaland and Dr. King concluded that Plaintiff's impairment did not meet or equal the criteria for a listed impairment. (Tr. 224-238.)

Plaintiff did not pursue therapeutic management that was recommended for her conditions, but she continued to have follow up checks with her psychiatrist regarding her medication. During these follow-ups, Plaintiff's memory remained within normal limits.

Three state agency medical sources reviewed the medical evidence in the record in November and December 2004. One of these state agency physicians opined that Plaintiff could perform medium work with no concentrated exposure to cold or hazards. D. Fugate, Ph.D., a state agency psychologist, agreed with Dr.

King's previous assessments of Plaintiff's condition. Maurice Praut, Ph.D., another state agency psychologist also agreed with the assessment of Dr. King and Dr. Fugate.

Plaintiff sought no mental health treatment from October 2004 until January 2005, when she was evaluated by Laura Harrison, L.C.S.W. of Eastern Shore Psychological Services. (Tr. 297-305.) Plaintiff reported glaucoma in her left eye, but denied vision problems. Plaintiff also reported normal household functioning. Ms. Harrison assessed Plaintiff a GAF score of 51. (Tr. 305.)

In February 2005, Plaintiff sought treatment from Dr. Wallace for left shoulder pain. X-rays revealed degenerative changes of the cervical spine and no abnormalities of the left shoulder. An MRI showed that Plaintiff had mild or minimal disc protrusions with no spinal cord impingement. (Tr. 275.)

On March 28, 2005, Plaintiff treated with Ronald C. Sabbagh, M.D., an orthopaedist, for left arm tingling and pain. (Tr. 258.) Plaintiff reported being "really health" other than a "a little bit of neck pain, but not very much." (Tr. 258.) Plaintiff had nearly the full range of motion of her neck. Dr. Sabbagh noted that Plaintiff had slight weakness in her left arm, but that she was right-handed. Dr. Sabbagh also noted that Plaintiff had positive Phalen's and forearm compression tests on the left, which suggested some nerve involvement. Dr. Sabbagh

8

opined that Plaintiff could have some cervical radiculopathy or carpal tunnel syndrome. A follow-up EMG showed mild left C5 radiculitis. (Tr. 259-261.) Subsequent visits with Dr. Sabbagh were unchanged, except that Dr. Sabbagh prescribed Naprosyn because Neurontin made Plaintiff "sleepy." Dr. Sabbagh also stated that Plaintiff could begin neural foraminal injections if her condition did not improve. (Tr. 257.)

Plaintiff had no further treatments or evaluations for five months. (Tr. 257-270.) In September 2005, Dr. Wallace, Plaintiff's treating primary care physician, completed a medical assessment of Plaintiff's mental ability to do work-related activities. Dr. Wallace opined that Plaintiff had "unlimited/very good" ability in 12 of the 16 areas assessed. Plaintiff was rated as "good" in her ability to behave in an emotionally stable manner. Plaintiff was noted to have fair ability to deal with work stresses, maintain attention and concentration, and her ability to deal with changes in a routine work setting was marked "unknown." (Tr. 294-295.)

In October 2005, Ms. Harrison and Fontana Israel, M.D., jointly completed a similar assessment. In a cover letter to the assessment, Ms. Harrison noted that Plaintiff "made significant progress since January," but that she continued to be at a high risk for relapse into chronic symptoms if additional stress was added to her life. (Tr. 343-344.) Both Ms. Harrison and Dr.

9

Israel opined in the joint assessment that Plaintiff had good or very good ability to follow work rules, use judgment, interact with supervisors, function independently, maintain personal appearance and demonstrate reliability. However, Plaintiff demonstrated fair ability to relate to co-workers, deal with the public, deal with work stress, maintain attention and concentration, behave in an emotionally stable manner and relate predictability in social situations. Ms. Harrison and Dr. Israel wrote that "Plaintiff has shown in the past that she is unable to handle stress and feelings of being overwhelmed in a pos. manner. She becomes extremely anxious and withdraws from support systems she had." (Tr. 345-346.) The criteria under making performance adjustments which concerns the ability to carry out job instructions was not evaluated and had slash marks through it.

B.  The A.L.J.'s Decision

Plaintiff attended the hearing with a non-attorney representative. At the hearing, Plaintiff testified that she drives, experiences no problems reading or writing other than a "little lack of concentration." (Tr. 358.) Plaintiff testified that she suffers from glaucoma, which has caused her vision to change, but that it is being successfully treated with medication and hasn't caused her to stop driving. (Tr. 360.) Plaintiff testified that the primary reasons she became unable to work were her psychological condition and her neck and back pain. (Tr.

10

364.) Plaintiff testified that she is a shy and nervous person, but that medications and counseling help her psychological condition. (Tr. 365-366.) Plaintiff testified that she doesn't like to be around people, that she basically always had this personality trait, and that it hadn't caused her problems at her previous work. (Tr. 376-377.) Plaintiff also testified that she suffers from three pinched nerves in her neck which cause her pain, and a dull aching pain in her back that radiates down her hip and into her leg from a ruptured disc. (Tr. 366-367.) Plaintiff testified that she takes no medications other than Tylenol for her neck and back pain. (Tr. 367.) Plaintiff also testified that she does not currently see any doctor for her back and hadn't since she moved from Maryland in 2001, explaining that her back condition is "livable." (Tr. 368.) With respect to her neck, Plaintiff testified that she just started seeing an orthopedic doctor in February 2005. (Tr. 369.) Plaintiff testified that she cannot do things like move furniture with her husband or wash windows because of the pain in her neck and arms. Plaintiff also testified that she has high blood pressure and that it is under control with medication. She also testified that she has irritable bowel syndrome, which she described as "very confining" because she "never know[s] when it's going to hit." (Tr. 370.) Plaintiff testified that she has acid reflux which is under control with medication.

11

Plaintiff testified that one of her medications makes her feel nauseated and that she has to eat something to avoid getting sick to her stomach. (Tr. 372.) Plaintiff testified that she can walk for an hour and that she can stand for half an hour as long as she shifts from foot to foot. (Tr. 373-374.) She also testified that she can sit for about 45 minutes with shifting. Plaintiff testified that she experiences pain bending and stooping, but that she could go back to the activity in about 10 minutes. Plaintiff testified that she can lift at least a gallon milk and that she has some shortness of breath going up and down the stairs. Plaintiff testified that she has no problems sleeping, no problems taking care of herself, that she sometimes cooks, and does light dusting and sweeping around the house. She testified that she volunteers at the food pantry at church and puts groceries into boxes for needy families about once a week. She goes to Bible study once a week, walks her dogs and attends church. (Tr. 377-380.)

The A.L.J. then consulted a vocational expert. (Tr. 384-393.) The A.L.J. asked the vocational expert to assume a person 53 years of age who has a high school education and work history similar to Plaintiff's work history, who could lift or carry twenty pounds occasionally, ten pounds frequently, stand or walk six hours in an eight hour day, sit six hours in an eight hour day, occasionally climb ramps and stairs, frequently balance,

12

stoop, kneel crouch and crawl, and must avoid concentrated exposure to extreme cold, fumes, odors, dust, gases, poor ventilation, and hazardous machinery and heights. The vocational expert testified that such a person could perform the Plaintiff's past relevant work as a medical records technician. The A.L.J. then added a further restriction that such an individual would be limited to jobs with simple tasks and instructions. The vocational expert testified that this additional limitation would preclude Plaintiff's past relevant work, but that such a person could still perform unskilled work at the light exertional level, like the job of office helper, of which there are 1200 jobs regionally and 120,000 jobs nationally. The vocational expert also identified the job of mail clerk, of which there were 900 jobs regionally and 90,000 jobs nationally, and machine tender in a clerical type position like a photocopy clerk, of which there were 1,000 jobs regionally and 100,000 jobs nationally.

In his decision dated June 5, 2006, the A.L.J. found that Plaintiff suffered from depression and degenerative disease with radiculopathy in the cervical spine, which are severe impairments, but do not meet or equal, alone or in combination, any listed impairments. (Tr. 16-24.) The A.L.J. also found that Plaintiff suffered from irritable bowel syndrome, high blood pressure and glaucoma, but that these conditions were controlled with medication and not severe. The A.L.J. further found that

13

Plaintiff's testimony regarding her limitations was not fully credible. The A.L.J. then determined that Plaintiff had the residual functional capacity ("RFC") to perform simple, unskilled, light work with the following additional limitations: only occasional climbing of ramps and stairs and no concentrated exposure to extreme cold, fumes, odor, dusts, gases, poor ventilation or hazards. The A.L.J. noted that the vocational expert identified several jobs that a person with this RFC could perform. Accordingly, the A.L.J. concluded that Plaintiff was not under a disability within the meaning of the Act.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), findings of fact made by the Commissioner of Social Security are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Monsour Medical Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. Id. In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. Id. at 1190-91.

The term "substantial evidence" is defined as less than a

14

preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 555 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. Id.; Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

## DISCUSSION

## I. Evaluation Of Disability Claims

Within the meaning of social security law, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which

15

has lasted or can be expected to last, for a continuous period of
not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A). To be found
disabled, an individual must have a "severe impairment" which
precludes the individual from performing previous work or any
other "substantial gainful activity which exists in the national
economy." 20 C.F.R. §§ 404.1505. In order to qualify for
disability insurance benefits, the claimant must establish that
he or she was disabled prior to the date he or she was last
insured. 20 C.F.R. § 404.131, Matullo v. Bowen, 926 F.2d 240,
244 (3d Cir. 1990). The claimant bears the initial burden of
proving disability. 20 C.F.R. § 404.1512(a); Podeworthy v.
Harris, 745 F.2d 210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations
require the A.L.J. to perform a sequential five-step analysis.
20 C.F.R. § 404.1520. In step one, the A.L.J. must determine
whether the claimant is currently engaged in substantial gainful
activity. In step two, the A.L.J. must determine whether the
claimant is suffering from a severe impairment. If the claimant
fails to show that his or her impairment is severe, he or she is
ineligible for benefits. Plummer v. Apfel, 186 F.3d 422, 427 (3d
Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds
to step three. In step three, the A.L.J. must compare the
medical evidence of the claimant's impairment with a list of

16

impairments presumed severe enough to preclude any substantial gainful work. Id. at 428. If the claimant's impairment meets or equals a listed impairment, the claimant is considered disabled. If the claimant's impairment does not meet or equal a listed impairment, the A.L.J.'s analysis proceeds to steps four and five. Id.

In step four, the A.L.J. is required to consider whether the claimant retains the residual functional capacity to perform his or her past relevant work. Id. The claimant bears the burden of establishing that he or she cannot return to his or her past relevant work. Id.

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy. At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied. Id. Specifically, the A.L.J. must find that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity. Id. In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments. At this step, the A.L.J. often seeks the assistance of a vocational expert. Id. at 428.

## II.   Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By her Motion, Plaintiff contends that the A.L.J.'s decision is not supported by substantial evidence. Specifically, Plaintiff contends that the A.L.J. erred in (1) assessing the severity of Plaintiff's medical problems; (2) assessing Plaintiff's credibility; and (3) determining her residual functional capacity. The Court will analyze each of Plaintiff's arguments in turn.

### A.   Whether The A.L.J. Erred In Assessing The Severity Of Plaintiff's Medical Problems

An impairment is "not severe" if it does not significantly limit a claimant's physical or mental capacity to perform basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). With regard to physical impairments, basic work activities include such activities as walking, standing, lifting, pushing, pulling, reaching, carrying or handling. A finding of severity under the regulations must be premised solely on a showing that medical factors exist which effect the plaintiff's ability to perform basic work activities. Vocational factors, such as age, education and work experience may not be considered.

Reviewing the A.L.J.'s decision in light of this criteria, the Court concludes that the A.L.J. did not err in concluding that Plaintiff's irritable bowel syndrome, high blood pressure and glaucoma were not severe impairments. Although Plaintiff

testified that her irritable bowel syndrome required her to be near a bathroom and was "very confining," Plaintiff also testified that her symptoms were only aggravated about once a month. Plaintiff also testified that she was unable to leave home due to fear and anxiety that her irritable bowel syndrome might flare up; however, Plaintiff also testified that she does volunteer work, goes grocery shopping, attends church, and goes to Bible study once a week. Plaintiff's testimony belies her contention that her irritable bowel syndrome is so severe as to significantly limit her ability to work. In addition, the Court notes that Plaintiff has few medical records substantiating her complaints of irritable bowel syndrome. Plaintiff was evaluated by a gastroenterologist and internist, Dr. Reindl, in September 2002, and Plaintiff did not seek any further follow-ups or additional treatment for this condition. Indeed, Plaintiff explained to Dr. Reindl that she was "generally feeling quite well," and experienced no weight loss, rectal bleeding or significant abdominal pain, except for abdominal spasms. She also had no change in bowel habits. Plaintiff underwent a colonoscopy which was normal.

As for her glaucoma, Plaintiff submitted no medical records to the A.L.J. substantiating her claim that her glaucoma significantly impacts her ability to work. In his treatment notes, Dr. Wallace briefly mentions that Plaintiff had "early

19

glaucoma," but there are no records from an opthamologist and no objective vision tests. Indeed, Plaintiff denied vision disturbances, including blurred or decreased vision, when she was examined by various physicians. In addition, Plaintiff's testimony regarding her daily activities belies her contention that she suffers from a sever vision impairment. In this regard, Plaintiff testified that she drives, goes to Bible study, and watches television for three hours each night. Moreover, Plaintiff testified that her glaucoma was controlled with medication.

As for her high blood pressure, the Court notes that even Plaintiff does not pursue specific argument in her Opening Brief regarding this condition. In any event, Plaintiff testified at the administrative hearing, that her high blood pressure was under control with medication.

Plaintiff also contends that the A.L.J. erred in failing to consider her problems with anxiety. Specifically, Plaintiff contends that the A.L.J. should have considered Listing 12.06 concerning anxiety-related disorders and her related testimony that her anxiety was severe. Although the A.L.J. concluded that Plaintiff suffered from depression, it is apparent in his decision that he considered Plaintiff's anxiety and the alleged limitations she suffered as a result of her anxiety. In this regard, the Court finds that the diagnostic label used by the

A.L.J. is not critical, because he considered all of the functional limitations raised by Plaintiff.  Moreover, Plaintiff's medical records suggest only one mental impairment, an adjustment disorder with anxiety and depressed mood.  Indeed, to the extent that other physicians characterized her mental limitations as two discrete conditions, the Court notes that treatment records do not separate the limitations arising from each disorder.  Accordingly, the Court finds no error in the A.L.J.'s labeling of or treatment of Plaintiff's mental symptoms, because he considered the relevant limitations and concluded that they were severe.

To the extent that the A.L.J. concluded that Plaintiff's condition failed to meet a listing, the Court likewise finds no error in the A.L.J.'s decision.  Although the A.L.J. did not specifically consider Listing 12.06 related to anxiety, he considered Listing 12.04 and the "B" criteria for both listings is identical.  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.06.  Therefore, if Plaintiff could not meet the "B" criteria for Listing 12.04, she could not meet that same criteria for Listing 12.06, regardless of whether she met the "A" criteria for Listing 12.06.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (individual's impairment must meet all, and not just some of the required criteria to meet that listing).  Accordingly, the Court finds no error in the A.L.J.'s analysis.

B.  Whether The A.L.J. Erred In Assessing Plaintiff's
    Credibility

Generally, the A.L.J.'s assessment of a plaintiff's
credibility is afforded great deference, because the A.L.J. is in
the best position to evaluate the demeanor and attitude of the
plaintiff.  See e.g. Fargnoli v. Massanari, 247 F.3d 34, 43 (3d
Cir. 2001); Griffith v. Callahan, 138 F.3d 1150, 1152 (7th Cir.
1998); Wilson v. Apfel, 1999 WL 993723, *3 (E.D. Pa. Oct. 29,
1999).  However, the A.L.J. must explain the reasons for his or
her credibility determinations.  Schonewolf v. Callahan, 972 F.
Supp. 277, 286 (D.N.J. 1997) (citations omitted).

In his decision, the A.L.J. concluded that Plaintiff had
medically determinable impairments that could reasonably be
expected to produce the symptoms she alleged, but that her
statements concerning the intensity, duration, and limiting
effects of those symptoms were not entirely credible.  (Tr. 20.)
In reaching this conclusion, the A.L.J. considered both
Plaintiff's testimony regarding her daily activities of living,
as well as her medical records.

Plaintiff contends that the A.L.J. improperly considered
Plaintiff's volunteer work as evidence that Plaintiff could
perform the regular duties of full-time work.  In the Court's
view, however, the A.L.J. did not equate Plaintiff's volunteer
work with her ability to perform full-time regular work
activities.  Rather, the A.L.J. examined the nature of

Plaintiff's volunteer work in the context of evaluating her statements regarding the severity of her conditions. For example, Plaintiff alleged that she did not leave the house because of her irritable bowel syndrome and related anxiety and that she was suffering from disabling pain, yet Plaintiff testified that she engaged in weekly volunteer work stocking cans on shelves and preparing grocery bags, as well as weekly Bible study groups, grocery shopping, driving, vacuuming, dusting and doing other light household chores. In this regard, the Court finds no error in the A.L.J.'s conclusion that Plaintiff's volunteer work, and indeed her other daily activities, demonstrates that she is "capable of some level of physical activity and that she is mentally able to perform work activities." (Tr. 20.)

In arguing that the A.L.J.'s credibility assessment was erroneous, Plaintiff contends that the A.L.J. mischaracterized the medical evidence in the record and ignored her GAF scores. However, Plaintiff's argument of mischaracterization is based on her subjective allegations regarding her condition. Plaintiff is required to produce medical findings supporting her subjective allegations, and those allegations are not required to be accepted by the A.L.J., unless they are substantiated by the record. 20 C.F.R. § 404.1529(b). In this case, the severity of Plaintiff's subjective complaints are unsupported by the medical

23

evidence in the record, and the Court finds no error in the
A.L.J.'s characterization of the medical evidence. As for her
GAF scores, the Court concludes that the A.L.J. properly
evaluated Plaintiff's mental condition as a whole and in light of
the full record, including the opinions of state agency
physicians which were consistent with the record[1], and therefore,
the Court concludes that the A.L.J. did not err in considering
the record evidence and assessing Plaintiff's credibility.

C. Whether The A.L.J. Erred In Determining Plaintiff's
Residual Functional Capacity

"[R]esidual functional capacity ["RFC"] is defined as that
which an individual is still able to do despite the limitations
caused by his or her impairment(s)." Fargnoli v. Massanari, 247
F.3d 34, 41 (3d Cir. 2001). When determining an individual's RFC
at step four of the sequential evaluation, the A.L.J. must
consider all relevant evidence including medical records,
observations made during medical examinations, descriptions of
limitations by the claimant and others, and observations of the
claimant's limitations by others. Id. Before an individual's
RFC can be expressed in terms of an exertional level of work, the
A.L.J, "must first identify the individual's functional
limitations or restrictions and assess his or her work related

---

[1]    See Jones v. Sullivan, 954 F.2d 125, 128-129 (3d
Cir.1991) (recognizing that a non-examining physician can provide
substantial evidence to support the A.L.J.'s decision).

24

abilities on a function by function basis." SSR 96-8p. The RFC must also address both the exertional and non-exertional capacities of the individual. Id.

Reviewing the A.L.J.'s RFC in light of the applicable legal principles, the Court concludes that the A.L.J. did not err in his determination that Plaintiff could perform simple, unskilled work with only occasional climbing of ramps or stairs, and no concentrated exposure to extreme cold, fumes, odors, dusts, gases poor ventilation and hazards. Plaintiff contends that the A.L.J. did not address her glaucoma, anxiety and depression, or cervical radiculitis and shoulder problems. However, as discussed infra, the objective medical evidence, as well as Plaintiff's own denials of visual impairment during her medical examinations, demonstrate that the A.L.J. was not required to include any visual limitations in his RFC assessment. Likewise, the medical evidence and Plaintiff's activities of daily living do not support her contention that the A.L.J. was required to consider limitations arising from cervical radiculitis and shoulder problems. (Tr. 88-89, 377-378.) An EMG showed only "mild" cervical radiculitis on Plaintiff's left side, and upon examination, Plaintiff had nearly the full range of motion. (Tr. 200, 259-261.) Dr. Sabbagh offered Plaintiff follow-up foraminal injections if her symptoms worsened, but Plaintiff never returned for treatment. (Tr. 257.)

The Court also concludes that the A.L.J. adequately accounted for Plaintiff's mental impairment by limiting her to unskilled work. The A.L.J.'s assessment was supported by the opinions of reviewing state agency physicians, as well as Plaintiff's treating physician, Dr. Wallace. As for Plaintiff's ability to manage stress, the Court concludes that the A.L.J. also properly evaluated her abilities in light of his credibility analysis of Plaintiff, and the evidence in the record. Specifically, the A.L.J. noted that Ms. Harrison encouraged Plaintiff to be active with her volunteer work, and the A.L.J. found the description of Plaintiff's ability to handle stress in her volunteer work to be comparable to the stress she would encounter in unskilled work.

In addition, the Court concludes that the A.L.J. posed appropriate hypothetical questions to the vocational expert which included the limitations supported by the record. Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Accordingly, the Court concludes that the A.L.J. did not err in determining Plaintiff's RFC, and his decision that Plaintiff was not disabled is supported by substantial evidence.

## CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment and deny Plaintiff's Motion For

Summary Judgment.   The decision of the Commissioner dated January
5, 2006, will be affirmed.

     An appropriate Order will be entered.